UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CALEB MITCHELL ROGERS,<br><br>Defendant. | Case No. 2:22-cr-00064-APG-EJY<br><br>**Report and Recommendation**<br><br>**Re: ECF No. 50 (Motion to Dismiss)** |

Pending before the Court is Defendants' Motion to Dismiss Based Upon Violations of Due Process Rights (ECF No. 50), which the Court has considered along with the government's Response (ECF No. 54), and Defendant's Reply (ECF No. 57). For the reasons stated below, the Court recommends the Motion to Dismiss be denied.

**I.    Background and Argument**

On March 22, 2022, Defendant was indicted on three counts of interference with commerce by robbery and one count of brandishing a firearm during and in relation to a crime of violence. The robberies occurred at Red Rock, Aliante, and the Rio (three hotel casino properties located in Clark County, Nevada) on November 12, 2021, January 6, 2022, and February 7, 2022, respectively. Defendant is alleged to have used a gun in the course of the robbery at the Rio. During the investigation conducted the F.B.I. and Las Vegas Metropolitan Police Department ("Metro"), law enforcement (the "Agents") interviewed Defendant's brother Josiah Rogers ("Josiah") and Defendant's coworker Justin Jonsson ("Jonsson"), a Metro police officer. Before his arrest, Defendant was employed by Metro, attended the police academy, and worked with Jonsson. Jonsson and Defendant were friends (at one time close friends).

A.    <u>Defendant's Argument</u>.

Defendant contends the interviews of Josiah and Jonsson were biased, prejudicial, and unreliable. Defendant says the Agents investigating the robberies "embarked on a course of conduct designed to 'solve'" robberies other than the Rio robbery "convincing" Josiah and Jonsson that

1

Defendant was the perpetrator. Defendant argues the Agents put pressure on Jonsson so they could "accuse, charge, and convict Defendant" of robberies other than the Rio robbery at which Defendant was arrested.

Defendant tells the Court the evidence offered in support of his separately filed Motion to Suppress also supports the instant Motion. Neither the Motion to Dismiss nor the Motion to Suppress cites exchanges between the Agents conducting the interviews and either witness in an effort to support dismissal.[1] Defendant says he filed the Motion to Dismiss "so as to preserve his right to seek the termination of these proceedings as a remedy for the violations of his due process rights." If the Court denies Defendant an evidentiary hearing, Defendant states he will renew his arguments once all evidence is presented at trial.

B. The Government's Argument.

After describing robberies at Red Rock and Aliante casinos, the government says Defendant was "tackled" by Rio security as he attempted to flee that robbery at which time Defendant pulled a gun and threatened to kill Rio security officers. When Metro arrived at the Rio, Defendant "identified himself" because one of the on-scene Metro officers knew Defendant by sight. Thereafter, Metro, with the F.B.I., conducted an investigation including interviews of Josiah and Jonsson. Josiah was reluctant to cooperate with the investigation providing some inaccurate information during his first interview (which was by phone) and non-responses during his second interview (which was in person). ECF Nos. 51-3, 51-4. Nonetheless, the government says Josiah identified his brother as the robber in security video from the Red Rock robbery and identified the car used in the Aliante robbery. The Agents also independently discovered the pickup truck used in the Red Rock robbery belonged to Josiah and was sold by him to a recycler approximately 4.5 hours

---

[1] Defendant's Motion to Suppress focuses on the identification of Defendant from surveillance video suggesting the witnesses were subject to coercive tactics leading to irreparable misidentifications. ECF No. 49. In his suppression Motion, Defendant mentions the use of the word "demons" as a disparaging and influential remark made by one of the investigating Agents. *Id*. Specifically, the F.B.I. agent says, on one occasion, that Defendant "let his demons get the best of him." ECF No. 51-1 at 26. This statement is not mentioned at all in Defendant's Motion to Dismiss and even if considered incorporated by reference does not change the Court's analysis or conclusion that no due process violation occurred. Defendant argues his brother's identification was unreliable because law enforcement told Josiah things "did not look favorabl[e]" for him and they wanted "his side of the story." ECF No. at 9. This argument also fails to demonstrate a due process violation.

after the Red Rock robbery occurred. The government concludes Defendant has not met the high bar required to demonstrate a due process violation.

## II. Discussion

### A. Defendant Fails to Demonstrate Outrageous Conduct by the Government Sufficient to Support a Due Process Violation.

*i.  Summary of the law.*

To dismiss an indictment based on government conduct a defendant must show "the actions of law enforcement officers … are so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *U.S. v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) *citing United States v. Russell*, 411 U.S. 423, 431-32 (1973). Dismissals based on outrageous government conduct are "limited to extreme cases in which the defendant can demonstrate that the government's conduct violated fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice." *Id. citing United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (internal quote marks omitted). "This is an extremely high standard." *Id. citing United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993) (further citation omitted). In the 2013 *Black* decision, the Ninth Circuit stated there were "only two reported decisions in which federal appellate courts … reversed convictions under this doctrine." *Id. citing United States v. Twigg*, 588 F.2d 373 (3rd Cir. 1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). A quick review demonstrates neither of these cases involved government interview tactics or is otherwise similar to the case at bar.[2] While there is no "bright line dictating when law

---

[2]  In *Twigg*, "all actions taken by … [the defendant] … until his arrest were at the specific direction of … the government agent," the defendant "contributed nothing in terms of expertise, money, supplies, or ideas" to the criminal conduct and, it appeared to the court the defendant "would not even have shared in the proceeds from the sale of the drug." *Twigg*, 588 F.3d at 383.
In *U.S. v. Haas*, 141 F.3d 1181 (Table), 1998 WL 88550 (9th Cir. Mar. 3, 1998), the Ninth Circuit noted that *Green* was abrogated in *United States v. Bogart* 783 F.2d 1428, 1434-35 (9th Cir.1986), *petition for rh'g granted and case remanded in non-relevant part by United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986). The court stated: "We have characterized outrageous government conduct by various highly restrictive terms, such as most narrow, shocking to the universal sense of justice, … only the most intolerable government conduct, and slim category. If the category is not empty in this circuit, then only one prior decision … arguably is included, *Green* …, which may be an entrapment rather than an outrageous government conduct case. *Green* predates [*United States v. Russell]* and *Hampton [v. United States*, 425 U.S. 484 (9th Cir.1976)], so does not reflect the current law of the circuit on outrageous government conduct." *Haas*, 1998 WL 88550, at *1.

enforcement conduct crosses the line between acceptable and outrageous," each case must be resolved by evaluating the facts of that case. *Black*, 733 F.3d at 302 (citations omitted).

Nonetheless, the Ninth Circuit set "ground rules" providing guidance to the lower courts. *Id*. When the government "engineers and directs a criminal enterprise from start to finish," uses "excessive physical or mental coercion to convince an individual to commit a crime," or "generates … new crimes merely for the sake of pressing criminal charges" outrageous government conduct is properly found. *Id*. (edited for grammatical purposes, internal brackets omitted, internal citations omitted). In contrast, the Ninth Circuit expressly rejects "artifice" and "stratagem" used to "ferret out criminal activity" as clearly not outrageous. *Id*. (internal citations omitted). Likewise "reverse sting operations "largely fall[] within the bounds of [reasonable] law enforcement tactics …." *Id*.

Further, when evaluating the government's conduct at issue, the Ninth Circuit suggests the Court consider: "(1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue." *Id*. at 303. While this rubric is applicable in many cases, it is not applicable here because the issue is not government involvement in the criminal activity, but the government's conduct while interviewing witnesses.

    ii.  *The interview of Justin Jonsson*.

The Jonsson interview commenced after Metro's Internal Affairs division received a call from Jonsson stating he had information related to Defendant who was recently arrested for robbery. ECF No. 51-1 at 2. *Id*. A review of the interview transcript shows nothing to support the contention that Jonsson was compelled to speak with the Agents or that he was reluctant to do so. In fact, the tone of the interview was cordial and conversational.

The transcript does not support that anyone participating in the interview was at any time agitated, hesitant, aggressive, or pressured. The exchanges reflect information gathering and nothing more. Jonsson freely responds when he did not have information the Agents sought and he is not threatened, implicitly or explicitly, at any time. ECF No. 51-1, *generally*. Suggested answers to

questions were not provided. *Id*. The interview touches on Jonsson's relationship with Defendant, the breadth of Jonsson's knowledge of Defendant's personal and family life, and Jonsson's knowledge of Defendant's personal habits, personal property, and family property. There is no argument presented suggesting the interview was exceptionally long, conducted in a coercive environment or under coercive conditions. There is not a single exchange the Court found to be shocking to the universal sense of justice or intolerable government conduct. Indeed, Defendant's position that Jonsson was pressured is not supported by a single exchange.

      iii.  *Interviews of Defendant's Brother, Josiah Rogers*.

  The Agents first interviewed Josiah Rogers over the telephone in April 2022. ECF No. 51-3 at 2. There is nothing in that interview summary (no transcript was provided to the Court) supporting the conclusion that the conditions under which this interview occurred were coercive. *Id*., *generally*. The interview commenced with basic fact gathering about when and where Josiah lived in Las Vegas (at one point with Defendant). *Id*. The interview quickly turned to a discussion of Josiah's truck allegedly used by Defendant in the Red Rock robbery. *Id*. Josiah told the officers he never had the truck's title, he could not recall the make of the truck, the color was a mix-match, but predominantly red, and he sold the truck to a guy he found on Craigslist whose name he did not remember. *Id*. Josiah also initially told the investigators Defendant never drove the truck, but later during the initial interview said Defendant might have done so.

  Josiah knew his brother had significant personal debt, and Josiah had wired his brother money. *Id*. Josiah said he knew his brother was a police officer, he and his brother talked over two apps (Marco Polo and Whats App), and that he had seen his brother get really drunk. *Id*. at 3. Since his arrest, Josiah confirmed speaking to his brother a couple of times. *Id.* Josiah also spoke with his brother's counsel who told Josiah he might be contacted by law enforcement, but he was not required to speak with the Agents. *Id.* Josiah said he wanted to be helpful, but he did not want to incriminate his brother or make it hard for him. *Id*.

  Josiah's second interview occurred in person. ECF No. 51-4. Again, only a summary of the interview was provided by Defendant. This interview occurred on November 16, 2022, approximately seven months after the first interview by phone and a year after the Red Rock robbery.

*Id*. at 2. As the interview commenced, Josiah asked whether he had to speak to the Agents. *Id*. Josiah was told no, "but with the evidence found during the investigation, Agents wanted his side of the story because it did not look favorably toward[s] him." *Id*. The summary states Josiah "then decided to speak with [the] Agents." *Id*.

Josiah admitted he knew his brother was arrested for robbing casinos. *Id*. Josiah also admitted to living with his brother for approximately one year before moving to Ohio in November 2021. *Id*. In this interview, Josiah stated he "drove an older model red S10 truck," but he did not remember whether the truck had a license plate. *Id*. Josiah was shown pictures of the truck, but he could not identify the truck until he was shown a picture in which he was driving the truck. *Id*. Josiah admitted the truck was red but faded to almost an orange color. *Id*. At first, Josiah again said he sold the truck "to a guy," to which the Agents displayed what the Court interprets as doubt about the truth of that answer (what exactly occurred is not clear from the summary). *Id*. When asked a second time "what he actually did with the truck," while the investigators stressed "the importance of being honest," Josiah admitted he sold the truck to a recycling company he contacted through a text and met at a school near Defendant's apartment. *Id*.

Josiah said that a couple of weeks before he left Las Vegas Defendant suggested Josiah should have the truck towed and recycled. *Id*. Josiah said he did not know about "the robbery" at the time.[3] *Id*. Josiah said his brother might have used his truck as Josiah would not have objected to him doing so and the keys were readily accessible. *Id*. The truck was kept in the garage and Josiah claimed no knowledge of his brother using the truck. *Id*.

Josiah told the investigators that his brother did not talk to him about the robberies and never spoke of robberies when sober. *Id*. Because the investigators believed Josiah knew more than he was saying, Josiah was "asked again, … specifically what" he knew about his brother committing robberies, what his brother told him, and when. *Id*. Josiah responded he could not say more because he was in a difficult situation as Defendant is his brother. *Id*. Josiah said he knew his brother did "bad things," but he did not want to give the government more ammunition than they already had. *Id*.

---

[3] The summary provided uses the word "robbery" not "robberies."

Josiah said Defendant drove a white hatchback vehicle when Josiah lived with him and, when showed a picture of a white Volkswagen Jetta "taken during the recovery of" Defendant's car, Josiah confirmed the picture of the recovered car looked like his brother's car. *Id*. at 3-4. Josiah also confirmed a picture of the car used in the Aliante robbery looked like a car his brother owned. *Id*. at 4. Josiah told the investigators he believed he could identify his brother if shown a surveillance photo, and when presented with a picture of the suspect robbing Red Rock Casino, Josiah said "yep, that's … [my brother's] nose." *Id*.

The interview went on to discuss Josiah's knowledge of Defendant's debts and child support, as well as Defendant's wish that he had money to invest. *Id*. Not long before the Rio robbery, Defendant also told Josiah "he had something in the works" and would send him money. Josiah deleted What App from his phone, but apparently had a text message he showed the Agents, one of which was dated November 12, 2021 (the date of the Red Rock robbery) at 3:40 a.m. when Defendant texted he was leaving work. *Id*. Having identified his brother from a surveillance photo taken during the Red Rock robbery, the Agents wanted to know if Josiah knew Defendant had his truck that night, noting the truck was towed the morning after the robbery. *Id*. at 4-5. Josiah did not identify his truck through a photo presented, but admitted the timing of the truck's recycling "looked bad." *Id*. Josiah remained clear that he did not know his brother had his truck. *Id*. Josiah also said he never saw his truck covered with trash bags.[4] Josiah was asked twice if Defendant would involve Josiah or Defendant's brother's girlfriend in a robbery. *Id*. Josiah answered twice that his brother would not involve his girlfriend.

    iv.  *Analysis*.

The first interview of Defendant's brother Josiah is barely mentioned in Defendant's Motion. A review of that interview demonstrates the Agents did not cross any line that might objectively be viewed as outrageous conduct by law enforcement agents. The second interview warned Josiah that things did not look good for him and the Agents wanted his side of the story. Agents also warned Josiah about being honest when responding to questions and asked repeated questions when the

---

[4] The government contends the Red Rock Resort and Casino robbery occurred "on November 12, 2021, at approximately 3:30 a.m." and that Rogers arrived and departed in an orange-red pickup truck covered with what appeared to be black plastic trash bags. ECF No. 54 at 2.

Agents did not think they were receiving full or honest answers. This conduct is not so outrageous as to demonstrate a due process violation.

"[T]hreats by government agents may theoretically be the basis for … a due process claim for unwarranted mental coercion, however, the standards" as applied to due process is objective and "is [a] much higher [standard] than the standard [applied to] a statutory entrapment defense." *U.S. v. Emmert*, 829 F.2d 805, 811 (9th Cir. 1987) ("threats must be viewed in their context and may not always constitute outrageous conduct"). In *Emmert*, the court contrasted circumstances in which "government agents engineer and direct the criminal enterprise from start to finish" to "the vulgarity and 'puffing' engaged in by all participants in" drug transactions. *Id*. at 811-12 *citing Kinsella v. United States ex rel. Singleton*, 361 U.S. 234 (1960); *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985); *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir. 1983). While the instant matter does not involve a drug transaction, the contrast is worthy of note and provides guidance to the Court.

Further, at least some decisions in the Ninth Circuit reject the argument that threats made by law enforcement agents are sufficient alone to demonstrate a due process violation unless the government manufactures the crime. *U.S. v. Fekri*, 650 F.2d 1044, 1046 (9th Cir. 1981) *citing United States v. Wylie*, 625 F.2d 1371 (9th Cir. 1980), *cert. denied sub nom., Perluss v. United States*, 449 U.S. 1080 (1981); *United States v. McQuinn*, 612 F.2d 1193 (9th Cir.), *cert. denied*, 445 U.S. 955 (1980) (agent's threatening statements to induce defendant to proceed with illegal plan not violative of due process).

In 2014, the United States District Court for the District of Arizona noted "[t]he Ninth Circuit has rejected the [due process violation] defense in a wide variety of cases." *U.S. v. Bunnell*, Case No. CR-14-00119-PHX, 2014 WL 6611545, at *3 (D. Ariz. Nov. 21, 2014) *citing, inter alia, United States v. Cuellar*, 96 F.3d 1179 (9th Cir. 1996) (finding no outrageous government conduct where the government paid a contingency fee to a confidential informant); *United States v. Winslow*, 962 F.2d 845 (9th Cir. 1992) (finding no outrageous government conduct where the government used an informant who arranged an out-of-state trip, directed purchase of bomb components, and was paid $90,000 for participation in investigation); *United States v. Slaughter*, 891 F.2d 691, 695-96 (9th Cir. 1989) (finding no outrageous government conduct where the government used an informant to

build a personal relationship with defendant and persuaded him to sell cocaine); *United States v. Simpson*, 813 F.2d 1462, 1464-71 (9th Cir. 1987) (finding no outrageous government conduct where the F.B.I. continued to use a woman informant who provided defendant sexual favors to lure the target into selling heroin); *United States v. Reynoso–Ulloa*, 548 F.2d 1329 (9th Cir. 1977) (finding no outrageous government conduct where threats and physical violence prevented defendant from exiting a criminal enterprise).

The Court also located one case in the Ninth Circuit addressing an interrogation, but of minors, and the tactics used together with the circumstances in that case are far from comparable to the circumstances in the case at bar. *Crowe v. County of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010). The District of North Dakota rejected a due process violation claim based on interview tactics of witnesses who complained the agents "tried to lead the statements of these two witnesses and put words in their mouth." *U.S. v. Rettinger*, Case No. 4:06-cr-43, 2006 WL 3193701, at **2, 5 (D. N.D. Nov. 1, 2006). In *McConkie v. Nichols*, 446 F.3d 258 (1st Cir. 2006), the First Circuit considered a Section 1983 substantive due process claim brought by a plaintiff arising out of the defendant tape-recorded non-custodial interview in which the plaintiff alleged the agent intentionally deceived him about his Fifth Amendment right against self-incrimination. *Id*. at 260. Pointing out the standard was satisfied only by an extreme and outrageous abuse of power, the First Circuit upheld the district court's grant of summary judgment to the detective and ruled the conduct did not shock the conscience. *Id*. at 261-62. In *U.S. v. Parker*, the Western District of New York cited the rejection of a due process violation based on an interview of a defendant who claimed the agent knew he was "psychotic, medicated, having hallucinations, and confined to a psychiatric hospital." 116 F.Supp.3d 159, 179 (W.D.N.Y. 2015) *citing United States v. Smith*, 7 F.3d 1164, 1169-70 (5th Cir.1993).

The totality of the case law reviewed demonstrates the Agents interviewing tactics as applied to Josiah, including the comments that things did not look good for him, the importance of being honest, and repeated questions when the agents did not believe Josiah was providing full and candid answers, whether considered together or separately, do not constitute outrageous government conduct violative of due process. The Agents' comments are not shocking to the conscience. The Court could locate no case in which the kind of conduct complained of by Defendant was addressed

by a federal court and found to violate due process. In sum, the Court finds the Agent's conduct did not violate due process principles that absolutely bar the government from invoking judicial processes to obtain Defendant's conviction.

B. <u>Defendant's Request for an Evidentiary Hearing is Denied</u>.

An evidentiary hearing on a due process violation is "required only if the supporting allegations … [are] sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim was presented." *United States v. Allison*, 414 F.2d 407, 410 (9th Cir. 1969) (internal citation omitted). While Defendant contends the content of his Motion meets this standard (*see* ECF No. 57 at 3), Defendant fails to point to anything definite, specific, detailed or nonconjectural upon which he relies to support the evidentiary hearing request. *Id*. References to dates of particular robberies (whether accurate or inaccurate) are not the kind of detailed information about impermissible, heavy-handed interview tactics necessary to support the call for an evidentiary hearing. Nor is the conclusion that the government's conduct was supposedly "shocking enough to the conscience" to warrant "closer scrutiny." *Id*. Indeed, as discussed above, the Court finds the government's interview of Jonsson was not shocking, coercive, or outrageous. The interview did not defy fundamental fairness or impugn due process. Although the Agent's interview of Josiah included warning language that things did not look good, and he needed to be honest when answering questions, this is a far cry from the types of conduct courts in and outside the Ninth Circuit have found sufficient to meet the high bar of outrageousness.

## III. Recommendation

Accordingly, and Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendant Rogers' Motion to Dismiss based upon Violation of Due Process Rights (ECF No. 50) be DENIED.

Dated this 22nd day of May, 2023.

_____
ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).